## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

OEHME, VAN SWEDEN &
ASSOCIATES, INC.,

     Petitioner,

     v.

MAYPAUL TRADING & SERVICES
LTD.; ELENA PINCHUK,

     Respondents.

Civil Action No.  12-05  (JDB)

## MEMORANDUM OPINION

Before the Court is petitioner Oehme, van Sweden & Associates, Inc.'s ("OvS") motion

for confirmation of an arbitration award in its favor and [9] respondents Maypaul Trading &

Services Ltd. and Elena Pinchuk's motion to vacate that award.[1]  For the reasons that follow, the

award will be confirmed in its entirety.

## BACKGROUND

The dispute in this case concerns a contract for architectural and landscape design

services on a property in Ukraine.  Resp'ts' Mot. to Vacate Arbitration Award [ECF 9] ("Mot.

Vacate") at 1.  OvS is a globally recognized landscape architecture firm based in Washington,

DC.  Tr. Arbitration Hr'g [ECF 9, Ex. C] ("Hearing Tr.") at 18.  Victor and Elena Pinchuk are a

prominent Ukranian couple.  Id. at 19.  In 2004, OvS met with the Pinchuks to discuss potential

projects on the grounds of a property in Kiev, Ukraine (the "Property").  Id. at 53-54.  According

---

[1] OvS filed its motion for confirmation in the Superior Court of the District of Columbia, and respondents removed the case to this Court.  See Notice of Removal [ECF 1].

1

to OvS's CEO, Lisa Delplace, the Pinchuks referred to the Property as their own, and on the

Property was a house under construction that was to be their home.  Id. at 67, 80.  The Property

was in fact owned, from September 3, 2004 to the present, by Svit Shylahiv Transportation and

Forwarding Company, LLC ("Svit Shylahiv").  Mot. Vacate, State Certificate of the Plot of Land

Ownership Right [ECF 9, Ex. G].  Svit Shylahiv is owned by Pantoho Limited, a company of

Cyprus controlled by a group of entities that have an "Investment Advisory Agreement" with

EastOne Group Limited.  Mot. Vacate, Investment Advisory Agreement #24 [ECF 9, Ex. N]

("EastOne-Pantoho Agreement") (signed March 20, 2009; effective July 1, 2008); id., Joint

Stipulation of Uncontested Facts [ECF 9, Ex. Q] ("Joint Stip.") at 2.  EastOne Group is solely

owned by Victor and Elena Pinchuk, and under the investment advisory agreement with Pantoho,

it has rights to give "advisory and consulting services" to Pantoho in relation to, among other

things, "operations and strategic planning," "financial advisory matters," and "the selection,

retention and supervision of top-managers of [Pantoho]'s subsidiaries."  See EastOne-Pantoho

Agreement ¶¶ 1.1, 1.2, 1.2.1, 1.2.4, 1.2.7; Joint Stip. at 2.  The investment advisory agreement

does not give EastOne Group ownership rights in Pantoho or its subsidiaries (including Svit

Shylahiv).

        After the initial meeting with the Pinchuks, OvS performed landscape design services on

the Property.  Id. at 80.  At first, no contract governed the parties' relationship; OvS sent invoices

to the Pinchuks for its services and was paid accordingly through a company called Fortlex

Limited.  Id. at 80, 82.  The house on the Property was later razed, and the Pinchuks asked OvS

to submit a design proposal for a new house to be built on the Property.  Id. at 91.  OvS

submitted a "master plan" that included the house, interior courtyard, lily pool, several gardens,

and rear garden terrace.  Id. at 96.  OvS, primarily through Lisa Delplace, and the Pinchuks,

through intermediaries Aurika Dmitrieva, Konstantin Ussar, and others, then negotiated a

contract to govern OvS's services going forward.  Id. at 90-93, 96-99.  Early letter proposals

circulated by OvS included signature lines for the Pinchuks and did not include an arbitration

clause.  Mot. Vacate, 2004-2006 Letter Proposals [ECF 9, Ex. I].  Later, more formal draft

agreements contemplated a "legal entity" as OvS's counterparty to the contract and included an

arbitration clause.  Id., 1/15/2007 Draft Agreement [ECF 9, Ex. L] (Agreement entered into by

OvS and "___ , a legal entity duly organized and operating under the laws of ___, with its

registered office at: ___, represented by ___ (hereinafter referred to as the 'Owner')").

Throughout the negotiations, Delplace believed that the Pinchuks owned the Property and that,

notwithstanding the space for a "legal entity" on draft agreements, the Pinchuks would be

designated as the owner on the final agreement.  Hearing Tr. at 142; 212-15.  But on the day the

contract was to be executed, Delplace learned that Maypaul would be the other signatory.  Id. at

150.  Delplace had never heard of Maypaul before that date but said that Ussar told her that

Maypaul was "Elena's representative."  Id. at 150, 158-59.  Delplace, who said she had "no

reason to believe otherwise," signed a contract with Maypaul on behalf of OvS.  See id. at 259.

        On paper, however, Maypaul did not sign the contract as the Pinchuks' "representative."

Maypaul is a company of Cyprus in which the Pinchuks are not officers, directors, or

shareholders.  Mot. Vacate, Certificate [ECF 9, Ex. O].  Svit Shylahiv, through Transport

Investments LLC,[2] had contracted with Maypaul "to provide all necessary services in connection

---

        [2] Respondents state that because neither Svit Shylahiv nor Transport Investments is a
party in this case, they do not have the agreement between Svit Shylahiv and Transport
Investments.  Mot. Vacate at 9 n.1.  The Court assumes that this agreement exists based on

with the search and organization of the landscape services" on the Property.  Mot. Vacate,

1/10/2007 Agency Agreement [ECF 9, Ex. M] ("Transport-Maypaul Agreement") ¶ 1.1.  The

"Agency Agreement" between Transport Investments and Maypaul authorized Maypaul to "(i)

sign any documents or agreements; (ii) effect all necessary payments; and (iii) make any other

settlements, in any event relating to the performing Services."  Id. ¶ 1.3.  On the Pinchuks' side,

before the signing of the contract, Ms. Pinchuk had entered into a preliminary lease agreement

with Svit Shylahiv, in which Svit Shylahiv had agreed to lease the Property to Ms. Pinchuk upon

completion of construction and improvements thereon.  Mot. Vacate, 8/1/2006 Prelim.

Agreement [ECF 9, Ex. B] ("Prelim. Lease") ¶¶ 1.1, 3.3.[2]  The preliminary lease agreement gave

Ms. Pinchuk the rights "to take part in choosing, ordering and performing interior

works . . . territory improvement works [on the Property]" and "to bring in reasonable critical

comments and desires in respect of the . . . construction, furnishing and improvement [on the

Property]."  See id. ¶ 3.2.

On February 2, 2007, OvS and Maypaul, designated as the "Owner," entered into the

agreement ("Agreement") that is at the heart of this dispute.  Agreement [ECF 9, Ex. A] at 1.

The Agreement does not mention Elena Pinchuk or her husband.  In the Agreement, OvS agreed

to provide landscape design services on the Property as specified in the Agreement and an

addendum thereto, and additional services "if requested, subject to an agreed upon revision in the

scope of services and authorized fee(s)."  Id. ¶¶ 1.1, 1.2.  In return, Maypaul agreed to pay OvS

---

respondents' representation.

[2] Ms. Pinchuk entered into the preliminary lease agreement under her maiden name, Elena
Franchuk.

$447,600 in twenty monthly installments, plus reimbursable expenses not to exceed 40% of the

monthly installment amount absent prior written approval by Maypaul.  Id. ¶¶ 7.1, 7.3, addendum

¶¶ 6.3.1, 6.4.  Under the Agreement, Maypaul was "not obliged to any payments that [were] not

specified in [the addendum] unless negotiated in advance and authorized in writing."  Id. ¶ 7.5.

All work was to be completed by July 1, 2008.  Id. addendum ¶ 5.1.  OvS was not liable for

"approvals or construction delays outside [its] scope of work," but any delays were to be

"documented in advance and approved by both parties."  Id. ¶ 6.4.  Services not included in the

Agreement or addendum or "not customarily furnished in accordance with generally accepted

[OvS] practice," if required, were to be provided "under separate agreement."  Id. ¶ 8.1.

The Agreement contains a number of provisions that are pertinent here, including: (1) an

integration clause stating that the Agreement "supersedes all prior negotiations, representations

or agreement, either written or oral" and "may be amended only by written instrument signed by

both Owner and [OvS]," id. ¶ 9.3; (2) a clause stating that the Agreement is "binding upon and

shall inure to the benefit of the parties and their respective successors, permitted assigns, legal or

personal representative, or partners," id. ¶ 9.2; (3) a District of Columbia choice of law clause, id.

¶ 9.1;[3] and (4) the following arbitration clause:

> All claims, disputes and other matters in question between the parties to this
> Agreement, arising out of or relating to this Agreement or the breach thereof, shall
> be decided by arbitration in the District of Columbia in accordance with the
> Construction Industry Arbitration Rules of the American Arbitration Association
> then obtaining unless the parties mutually agree in writing otherwise.  This
> Agreement to arbitrate and any agreement to arbitrate with an additional person or
> persons duly consented to by the parties to this Agreement shall be specifically

---

[3] "This Agreement is deemed to be negotiated and executed in the District of Columbia, is to be performed at least in significant part in the District of Columbia, is governed by its law, and may be enforced in that jurisdiction."  Agreement ¶ 9.1.

enforceable under the prevailing arbitration law.  Arbitration fees may be assessed.

Id. ¶ 4.1.

After the Agreement was executed, Ms. Pinchuk played a central role in directing the services provided by OvS under the Agreement.  For example, representatives of Ms. Pinchuk and Svit Shylahiv referred to Ms. Pinchuk as the "client" or "customer" and looked to Ms. Pinchuk for approval on design, price, and payment issues, and Ms. Pinchuk communicated with OvS about the Agreement in person, by email, and through her representatives.  See Arbitration Award [ECF 9, Ex. D] ("Award") at 19-23; Hearing Tr. at 265-66; 297-98; 397; 477-97.  At the request of Ms. Pinchuk or her representatives, OvS made significant modifications to the landscape design plans, and as a result of these changes and delays in the construction of the house (that were beyond OvS's control), OvS's completion of the work was delayed.  See Award at 23-24; Hearing Tr. at 112-13; 186-87; 189-90.  As early as December 2007, OvS raised the subject of an addendum covering additional services beyond the Agreement's July 1, 2008 completion date.  See Hearing Tr. at 188.  OvS discussed the addendum with representatives of Ms. Pinchuk in the ensuing months but did not send them a draft addendum until July 2008.  Id. at 191.  At that time, OvS had completed all but the final phase of the project set out in the original Agreement.  Id. at 197.  OvS continued to provide services on the Property and asked for additional payments for these services.  Several drafts of the addendum were circulated, but none was executed, and in October 2008 OvS stopped work on the Property.  See id. at 128; Award at 24; Mot. Vacate, Emails [ECF 9, Ex. P].  Maypaul paid OvS in full under the original Agreement in the amounts of $447,556.25 for professional fees (which included $50,000 allotted to the not-

yet-completed final phase) and $175,016.64 for reimbursable expenses.  See Agreement addendum ¶¶ 5.1, 6.1; Mot. Vacate, Kiev Project Summary [ECF 9, Ex. V] ("Kiev Project Invoice").  The final phase of the project was never completed, and Maypaul refused to make any additional payments.

On April 13, 2010, OvS filed a demand for arbitration under the Construction Industry Arbitration Rules of the American Arbitration Association ("AAA Construction Rules") against Ms. Pinchuk and Maypaul.  OvS's Opp. to Mot. Vacate [ECF 10] ("Opp."), Demand for Arbitration [ECF 10, Ex. 2].  OvS alleged that respondents had breached the Agreement and had been unjustly enriched because respondents had not paid OvS for services it provided after July 1, 2008.  Id. at 5-7.  OvS sought damages, or in the alternative, restitution, in the amount of $169,933.96,[4] plus interest at 18% per annum, attorney's fees, and costs.  Id. at 7.  Ms. Pinchuk objected to the jurisdiction of the arbitrator, and Maypaul filed a counterclaim for $50,000 based on OvS's non-completion of the project's final phase.  Mot. Vacate, Resp'ts' Answering Statement & Statement of Countercls. [ECF 9, Ex. W] at 4-5.  After submissions from the parties on the issue of arbitral jurisdiction, the arbitrator determined that OvS had made a prima facie showing of jurisdiction over Ms. Pinchuk and deferred final resolution of the issue until after the hearing.  See Award at 4-5.  The arbitrator held hearings in February and March 2011, at which Ms. Pinchuk appeared specially to contest jurisdiction.  See Hearing Tr. at 5.  The arbitrator issued an award for OvS on October 26, 2011.  Award at 53.

The arbitrator concluded, first, that he had jurisdiction over Ms. Pinchuk, a nonsignatory

---

[4] The amount sought accounted for a "credit" of $50,000 to Maypaul for the work that was paid for but not completed.  See Award at 42; Kiev Project Invoice.

to the Agreement, based on theories of disregard of the corporate personality, estoppel, and agency. See id. at 26-31. He next held in favor of OvS on the merits, concluding that despite there being no modifications to the Agreement in writing, the parties had agreed to material modifications of the scope and duration of work under the Agreement, and that Maypaul and Ms. Pinchuk breached the Agreement as modified by not paying OvS for professional fees and expenses incurred after June 30, 2008. See id. at 40, 44. The arbitrator concluded, in the alternative, that OvS was entitled to restitution in quantum meruit. Id. at 45-46. The arbitrator awarded OvS: (1) damages in the amount of $281,710.14 (OvS's professional fees less $50,000, plus reimbursable expenses, plus interest at a rate of 18% per annum through October 15, 2011); (2) attorney's fees and costs in the amount of $178,985.46; (3) $26,290.00 as reimbursement for arbitration fees and expenses; and (4) post-award interest on the total at a rate of 3% per annum beginning 30 days after the date of the award. Id. at 47-49, 52; see also Kiev Project Invoice. The arbitrator denied Maypaul's counterclaim because the damages sought by OvS had already been reduced by $50,000. Award at 48.

### DISCUSSION

The parties agree that District of Columbia law governs the Agreement and that the District of Columbia Revised Uniform Arbitration Act ("DCRAA"), D.C. Code §§ 16-4401 et seq., applies to the Award. See Agreement ¶ 9.1; Mot. Vacate at 1, 12, 30; Opp. at 1, 7 n.7, 9 n.9.[5]

---

[5] Courts have held that a "generic" choice-of-law clause, such as that here, see Agreement ¶ 9.1, is insufficient to preclude application of the Federal Arbitration Act ("FAA"). See, e.g., Mastrobuono v. Shearson Lehman Hutton, Inc., 514 U.S. 52, 59, 62 (1995); Foulger-Pratt Residential Contracting, LLC v. Madrigal Condos., LLC, 779 F. Supp. 2d 100, 109 & n.9 (D.D.C. 2011) (collecting cases). Because the parties agree that the DCRAA applies, however,

Judicial review of arbitration awards is "extremely limited." Bolton v. Bernabei & Katz, PLLC, 954 A.2d 953, 959 (D.C. 2008) (quoting Lopata v. Coyne, 735 A.2d 931, 940 (D.C. 1999)); accord Foulger-Pratt, 779 F. Supp. 2d at 113. Courts generally "will not set aside an arbitration award for errors of either law or fact made by the arbitrator." Dolton v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 935 A.2d 295, 298 (D.C. 2007) (internal quotation marks and citation omitted). Under the DCRAA, a court may vacate an arbitration award only on one of six grounds set by statute or on "other reasonable ground." D.C. Code § 16-4423(a)-(b). An arbitration award may also be vacated if the arbitrator "manifestly disregarded the law." See Cathedral Ave. Coop., Inc. v. Carter, 947 A.2d 1143, 1151 (D.C. 2008) (internal quotation marks and citation omitted); Shore v. Groom Law Grp., 877 A.2d 86, 91 (D.C. 2005). But see Laszlo N. Tauber, M.D. & Assocs. v. Trammell Crow Real Estate Servs., 738 A.2d 1214, 1217 n.5 (D.C. 1999).[6]

Respondents contend that the Award against them should be vacated under the DCRAA. Ms. Pinchuk asserts one of the six statutory grounds, arguing that as to her, "[t]here was no agreement to arbitrate" because she was not a party to the Agreement. See D.C. Code § 16-4423(a)(5). Maypaul argues that the arbitrator "manifestly disregarded the law" in ruling for OvS

---

and because "there is nothing in the D.C. arbitration law that conflicts with the policy behind the FAA," the Court will apply the DCRAA. See Foulger-Pratt, 779 F. Supp. 2d at 109-10 & n.10; see also Ekstrom v. Value Health, Inc., 68 F.3d 1391, 1393, 1395-96 (D.C. Cir. 2004).

[6] It is unclear whether the "manifest disregard" standard remains an independent basis for vacating an arbitration award under the FAA after the Supreme Court's decision in Hall St. Assocs. v. Mattel, Inc., 552 U.S. 576 (2008). See Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp., 130 S. Ct. 1758, 1768 n.3 (2010). The Court will assume that "manifest disregard of the law" is a ground for vacatur falling within the "other reasonable ground" language of the DCRAA. See A1 Team Holdings, LLC v. Bingham McCutchen LLP, 998 A.2d 320, 324-25 & n.7, 327 (D.C. 2010) (discussing D.C. Code § 16-4423(b)).

on the merits.  The Court will address respondents' arguments in turn.

I.      Arbitral Jurisdiction over Ms. Pinchuk

Before deciding the arbitrability question – here, whether Ms. Pinchuk, as a nonsignatory to the Agreement, can be compelled to arbitrate under the Agreement – the Court must decide a threshold question: "'who has the primary power to decide arbitrability.'"  See First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 943 (1995).  This question "turns upon what the parties agreed about that matter[:] Did the parties agree to submit the arbitrability question itself to arbitration?"  Id.  If so, the Court will defer to the arbitrator's decision on arbitrability, setting it aside "only in certain narrow circumstances."  Id.; see also D.C. Code § 16-4423(a)-(b).  But if the parties did not agree to arbitrate the arbitrability question, the Court will decide that question de novo.  See First Options, 514 U.S. at 943.  Courts do not presume that parties agreed to arbitrate arbitrability and will find that they did only if there is "clear and unmistakable evidence" of such an agreement.  See id.; see also Howsam v. Dean Witter Reynolds, Inc., 537 U.S. 79, 83 (2002); AT & T Techs., Inc. v. Commc'ns Workers of Am., 475 U.S. 643, 649 (1986).  To determine whether "clear and unmistakable evidence" exists, courts apply principles of ordinary state-law contract formation.  First Options, 514 U.S. at 944.

A.      *Did Ms. Pinchuk clearly and unmistakably agree to arbitrate arbitrability?*

Relying on First Options, OvS argues that Ms. Pinchuk's conduct during the arbitration shows that she clearly and unmistakably agreed to arbitrate arbitrability.  Opp. at 8-13.  OvS stresses that Ms. Pinchuk submitted the question of arbitral jurisdiction to the arbitrator, citing, among other things, her statement of issues for decision by the arbitrator and her failure to "assert that the Arbitrator lacked the authority to decide arbitral jurisdiction or reserve the right for the

court to decide the question." Opp. at 11. OvS also asserts that Ms. Pinchuk's consent to application of the AAA Construction Rules, and specifically Rule 9, which gives the arbitrator "power to rule on his or her own jurisdiction," is further evidence of a "clear and unmistakable" agreement to arbitrate arbitrability. Id. at 12.

The Court is not persuaded. As the Supreme Court stated in First Options, "merely arguing the arbitrability issue to an arbitrator does not indicate a clear willingness to arbitrate that issue." 514 U.S. at 946. Here, like the nonsignatories to the arbitration agreement in First Options, see id., Ms. Pinchuk consistently and "forcefully object[ed]" to the arbitrator deciding the dispute, as noted by the arbitrator in his initial procedural order, at the hearing, and in the Award. Procedural Order No. 1 [ECF 10, Ex. 5] at 1 ("Nothing in this Procedural Order is to be understood to constitute a waiver of Pinchuk's objections to jurisdiction, and she reserves all rights to contest jurisdiction, both before the Arbitrator or in any other appropriate venue."); Hearing Tr. at 7 ("I note that there is a jurisdictional objection by Ms. Pinchuk in these proceedings. That objection has been preserved."); Award at 26 ("Ms. Pinchuk has consistently objected to arbitral jurisdiction over her in this dispute."). She also agreed to produce documents in discovery "subject to reserving the right to challenge jurisdiction after the Arbitrator's final ruling on the issue" and appeared specially at the hearing to contest jurisdiction. Resp'ts' Reply, 12/28/2010 Email [ECF 12, Ex. A] at 7; Hearing Tr. at 5. Ms. Pinchuk's conduct during the arbitration, far from clearly establishing her agreement to be bound by the arbitrator's decision on arbitrability, showed that she "did not want the arbitrator[] to have binding authority over [her]." See First Options, 514 U.S. at 946.

That the parties agreed on the conduct of the arbitration in accordance with the AAA

Construction Rules does not change the Court's conclusion.  Ms. Pinchuk so agreed "[s]ubject to"

her objections to arbitral jurisdiction.  Procedural Order No. 1, at 1.  Incorporation of AAA rules

giving an arbitrator power to decide arbitrability may constitute "clear and unmistakable

evidence" as required by First Options.  See, e.g., Qualcomm Inc. v. Nokia Corp., 466 F.3d 1366,

1373 (Fed. Cir. 2006); Contec Corp. v. Remote Solution Co., 398 F.3d 205, 208-09 (2d Cir.

2005); Grynberg v. BP P.L.C., 585 F. Supp. 2d 50, 54-55 (D.D.C. 2008) (citing Avue Techs.

Corp. v. DCI Grp., L.L.C., No. 06-327 (JDB), 2006 WL 1147662, at *6-7 (D.D.C. Apr. 28,

2006)).  But the cases cited by OvS on this point did not involve a nonsignatory's obligation to

arbitrate.  In Grynberg, for example, the plaintiffs argued that their claim was beyond the scope

of an arbitration agreement with the defendants but did "not seriously contest the existence or

validity of the arbitration agreement."  585 F. Supp. 2d at 53; see also Contec, 398 F.3d at 211

(holding that signatory to arbitration agreement was compelled to arbitrate question of

arbitrability with nonsignatory); Avue Technologies, 2006 WL 1147662, at *5.  A signatory to a

contract has clearly and unmistakably agreed to its terms, but that is not necessarily true of a

nonsignatory.  Here, Ms. Pinchuk did not sign the Agreement incorporating the AAA

Construction Rules, she agreed to arbitrate under these Rules subject to reservation of "all rights

to contest jurisdiction, both before the Arbitrator or in any other appropriate venue," and she did

not otherwise forfeit her right to judicial review of arbitrability.  See Davis v. Chevy Chase Fin.

Ltd., 667 F.2d 160, 167-68 (D.C. Cir. 1981); Grad v. Weatherholt Galleries, 660 A.2d 903, 907-

08 (D.C. 1995); Procedural Order No. 1, at 1 (emphasis added).  Because Ms. Pinchuk did not

clearly and unmistakably agree to arbitrate arbitrability, the Court will independently decide

whether she is bound to arbitrate under the Agreement.

B.     *Is Ms. Pinchuk bound to arbitrate under the Agreement?*

A nonsignatory to an arbitration agreement may be bound by that agreement under traditional principles of contract and agency law.  See Arthur Andersen LLP v. Carlisle, 556 U.S. 624, 631 (2009) (citing 21 Richard A. Lord, Williston on Contracts § 57:19, at 183 (4th ed. 2001)).  The theories for binding nonsignatories to arbitration agreements include incorporation by reference, assumption, agency, veil piercing/alter ego, estoppel, and third-party beneficiary. See id.; Bridas S.A.P.I.C. v. Gov't of Turkmenistan, 345 F.3d 347, 356 (5th Cir. 2003); Thompson-CSF, S.A. v. Am. Arbitration Ass'n, 64 F.3d 773, 776 (2d Cir. 1995).  Here, the arbitrator held that Ms. Pinchuk was bound by the Agreement's arbitration clause on the alternative theories of disregard of corporate personality (akin to piercing the corporate veil), equitable estoppel, and agency.  See Award at 26-31.  Ms. Pinchuk argues that none of these theories properly apply here.  See Mot. Vacate at 14.

1.     Veil piercing/alter ego

Under District of Columbia law, a party seeking to pierce the corporate veil and thereby establish that a corporation is an alter ego of an individual must show by "affirmative evidence" (1) "unity of ownership and interest" between the corporation and the individual and (2) "use of the corporate form to perpetrate fraud or wrong."  See Jackson v. Loes Wash. Cinemas, Inc., 944 A.2d 1088, 1095 (D.C. 2008) (internal quotation marks and citation omitted).  Unity of ownership and interest may be established "by showing domination and control of a corporation." Vuitch v. Furr, 483 A.2d 811, 816 (D.C. 1984).  The arbitrator did not apply this two-pronged test per se, but in concluding that Ms. Pinchuk "clearly disregarded the corporate personality of Maypaul," the arbitrator effectively found that the "unity of ownership and interest" prong was

satisfied.  He found that the Property was "owned and controlled by a company owned and controlled by the Pinchuks, Svit Shylahiv"; that "[t]he rights and responsibilities of the 'Owner' under the Contract were exercised by individuals employed by companies owned and controlled by the Pinchuks, acting at the direction of the 'Client' – Ms. Elena Pinchuk"; and that "Ms. Pinchuk was responsible for making payments under the Contract, regardless of Maypaul's formal obligation."  Award at 27-29.

Ms. Pinchuk disputes these findings, and indeed Maypaul is not formally owned or controlled by Ms. Pinchuk.  The Court need not resolve this factual dispute, however, because even assuming that there was unity of ownership and interest between Maypaul and Ms. Pinchuk, that alone would not be sufficient to pierce the corporate veil.  OvS has not offered – to the arbitrator or to this Court – any "affirmative evidence" of fraud.  See Jackson, 944 A.2d at 1095. The arbitrator did not cite fraud or deception in the Award, nor does the Court see any on this record.  See id.  Accordingly, the Court holds that Ms. Pinchuk cannot be compelled to arbitrate by piercing Maypaul's corporate veil.

2.      Estoppel

The doctrine of equitable estoppel may preclude a party from "asserting that the lack of his signature on a written contract precludes enforcement of the contract's arbitration clause when he has consistently maintained that other provisions of the same contract should be enforced to benefit him."  Int'l Paper Co. v. Schwabedissen Maschinen & Anlagen GMBH, 206 F.3d 411, 418 (4th Cir. 2000); see also Wash. Mut. Fin. Grp., LLC v. Bailey, 364 F.3d 260, 267 (5th Cir.

2004).[7]  A nonsignatory may be bound to arbitrate if he or she "knowingly seek[s] and obtain[s] 'direct benefits' from [a] contract," "seek[s] to enforce the terms of that contract," or "assert[s] claims that must be determined by reference to that contract."  See Noble Drilling Servs., Inc. v. Certex USA, Inc., 620 F.3d 469, 473 (5th Cir. 2010).  Citing International Paper and American Bureau of Shipping v. Tencara Shipyard S.P.A., 170 F.3d 349, 353 (2d Cir. 1999), the arbitrator found that Ms. Pinchuk "was, and considered herself to be, the client and customer of OvS" and "claim[ed] the direct benefit of the Contract," and as such was equitably estopped from denying an obligation to arbitrate under that same contract.  Award at 30.  The arbitrator based this conclusion primarily on a January 26, 2009 email from Ms. Pinchuk (then Franchuk) to Lisa Delplace.  See id. at 28-29.  The email is written in the first-person singular and plural and contains statements suggesting that Ms. Pinchuk, in the arbitrator's words, "was responsible for payments under the Contract" and "expected performance of the Contract for her reciprocal benefit in response."  Id. (citing Mot. Vacate, 1/26/2009 Email [ECF 9, Ex. S]).[8]

Ms. Pinchuk contends that neither this email nor any "benefit" she received from OvS's performance of the contract estops her from avoiding arbitration.  Mot. Vacate 22-24.  The Court

---

[7] The Court is not aware of any District of Columbia cases applying the doctrine of equitable estoppel to nonsignatories to an arbitration agreement and hence looks to federal court cases applying the doctrine in this context.  See Wash. Mut., 364 F.3d at 267 n.6.

[8] See, e.g., 1/26/2009 Email ("[W]e agreed [on] a substantial price up front for the work to be undertaken, and we have been making regular and timely payments to you under the Contract to the total of US $622,572.89, which shows our trusting relationship with you and our expectation of the respective timely performance of quality services on your side."); id. ("Having already paid you the money due under the Contract, in the spirit of good faith we would strongly ask that you complete the work on the garden as soon as practicable, following which we will consider your invoices issued under the Contract and in line with our understanding as set out in this letter.").

agrees.  On the one hand, Ms. Pinchuk, through the January 26, 2009 email and other conduct influencing the design services on the Property, has arguably sought to "enforce" the Agreement's terms – for example, the caps on total fees and reimbursable expenses.  See Noble Drilling, 620 F.3d at 473; 1/26/2009 Email.  And as a future lessee of the Property, Ms. Pinchuk stood to benefit from OvS's performance.  Hence, there is an equitable argument for holding Ms. Pinchuk to the Agreement and its arbitration clause based on her undisputed role in the Agreement's formation and performance, and for saying that in fairness she must abide by its terms.  On the other hand, the Court "must be careful about disregarding the corporate form and treating a non-signatory like a signatory."  See E.I. Dupont de Nemours & Co. v. Rhone Poulenc Fiber & Resin Intermediates, S.A.S., 269 F.3d 187, 201 (3d Cir. 2001).  Most significant here, Ms. Pinchuk has not asserted any claims against OvS.  See Noble Drilling, 620 F.3d at 473.  In the mine run of cases holding a nonsignatory bound under equitable estoppel, including those doing so based on the receipt of "direct benefits" rather than the assertion of contract-based claims, the nonsignatory had sued the signatory based in part on the agreement at issue.  See Bridas, 345 F.3d at 362 (collecting cases); Int'l Paper, 206 F.3d at 418; Am. Bureau of Shipping, 170 F.3d at 353 (requiring nonsignatory owners to arbitrate their claims against signatory because owners had received direct benefits of lower insurance rates and ability to sail under French flag); see also Hellenic Inv. Fund, Inc. v. Det Norske Veritas, 464 F.3d 514, 518 (5th Cir. 2006).  That Ms. Pinchuk not only has not sued on the contract but has not sued at all weighs strongly against application of estoppel in this case.  See Bridas, 345 F.3d at 362.

Moreover, even if equitable estoppel might be appropriate in some cases where a nonsignatory brings no claims against a signatory, any benefits Ms. Pinchuk received from OvS's

16

performance of the Agreement were not sufficiently "direct" to estop her here.  See, e.g., MAG Portfolio Consultant, GMBH v. Merlin Biomed Grp. LLC, 268 F.3d 58, 61 (2d Cir. 2001) ("The benefits must be direct – which is to say, flowing directly from the agreement.").  The improvements to the Property "flowing directly" from the Agreement directly benefitted Svit Shylahiv, who owned the Property, and may have directly benefitted Ms. Pinchuk in the future, had she leased the Property.  See id.  But they did not directly benefit Ms. Pinchuk during the duration of the Agreement, as she did not own the Property and had signed only a "preliminary" agreement to lease it, a final lease agreement having been contingent on the completion of construction on the Property.  See Prelim. Lease ¶ 3.3.  And Ms. Pinchuk's rights under the preliminary lease to comment on and "take part in choosing, ordering and performing" the design and construction on the Property gave her tangible rights in the Property only if a final lease agreement was executed.  See id. ¶ 3.1.  In short, Ms. Pinchuk received only indirect, contingent benefits from the Agreement and hence is not equitably estopped from avoiding arbitration.

        3.      Third-party beneficiary

The doctrine of third-party beneficiary is similar to the doctrine of equitable estoppel.  Although the arbitrator did not expressly rely on it, he quoted from a case discussing third-party beneficiary status to find that the Agreement was "'directly and unequivocally intended to benefit'" Ms. Pinchuk, and Ms. Pinchuk disputes that she was a third-party beneficiary.  See Award at 29 (quoting Nortel Networks, Inc. v. Gold & Appel Transfer, S.A., 298 F. Supp. 2d 81, 90 (D.D.C. 2004)); Mot. Vacate at 29-30.  The Court will therefore consider the application of third-party beneficiary doctrine to this case.

"Third-party beneficiary status requires that the contracting parties had an express or

implied intention to benefit directly" the party urged to be a third-party beneficiary.  See Fort Lincoln Civic Ass'n v. Fort Lincoln New Town Corp., 944 A.2d 1055, 1064 (D.C. 2008) (internal quotation marks and citation omitted).  In contrast to equitable estoppel, which looks to the parties' conduct "after the contract was executed," third-party beneficiary theory looks to the parties' intentions "at the time the contract was executed."  See Dupont, 269 F.3d at 200 n.7.  "An indirect interest in the performance of the undertakings is insufficient."  Fort Lincoln, 944 A.2d at 1064 (internal quotation marks, citation, and alteration omitted).

The Agreement here makes no reference to Ms. Pinchuk, as a third-party beneficiary or otherwise.  To the contrary, the Agreement provides that it "shall be binding upon and inure to the benefit of the parties and their respective successors, permitted assigns, legal or personal representative, or partners."  Agreement ¶ 9.2.  This provision suggests that the parties did not "directly and unequivocally" intend the Agreement to benefit Ms. Pinchuk, since it expressly lists the Agreement's beneficiaries and does not include Ms. Pinchuk among them.  See DuPont, 269 F.3d at 196; Sazerac Co. v. Falk, 861 F. Supp. 253, 258 (S.D.N.Y. 1994).  Assuming that, notwithstanding this provision, the parties could have impliedly intended Ms. Pinchuk to be a third-party beneficiary of the Agreement, they did not do so.  Ms. Pinchuk's role in negotiating the Agreement, "without more, has nothing to with whether [she] was a third party beneficiary," see DuPont, 269 F.3d at 197, and as discussed above, her interest in the performance of the Agreement was only indirect, see Fort Lincoln, 944 A.2d at 1064 (requiring that parties to contract intend to benefit third-party beneficiary "directly").  Finally, Ms. Pinchuk has not asserted any claims based on her alleged third-party beneficiary status.  See Bridas, 345 F.3d at 363; Dupont, 269 F.3d at 197.  Hence, Ms. Pinchuk is not bound to arbitrate as a third-party

18

beneficiary.

      4.     Agency

A principal may be bound by an arbitration agreement signed by its agent if the agent had actual or apparent authority to act on behalf of the principal.  See Thompson-CSF, 64 F.3d at 776; Restatement (Third) of Agency § 6.01 (2006).[9]  Actual authority is determined from the principal's manifestations to the agent.  See Makins v. District of Columbia, 861 A.2d 590, 593 (D.C. 2004).  Apparent authority, on the other hand, depends on the principal's manifestations to a third person, and "arises when a principal places an agent in a position which causes a third person to reasonably believe the principal had consented to the exercise of authority the agent purports to hold."  See Sigal Constr. Corp. v. Stanbury, 586 A.2d 1204, 1218-19 (D.C. 1991).  "Critical" to apparent authority is "the third-party's perception of the agent's authority."  Id. at 1219.

In this case, there is no evidence that Ms. Pinchuk manifested her assent to Maypaul to act on her behalf.[10]  The question, then, is whether Maypaul, the alleged agent, had apparent

_____

    [9] Extrinsic evidence, although not admissible to contradict or vary the terms of a written contract, is admissible to identify the contracting parties if their identity is in dispute.  See Affordable Elegance Travel, Inc. v. Worldspan, L.P., 774 A.2d 320, 327 (D.C. 2001); see also MJR Int'l, Inc. v. Am. Arbitration Ass'n, No. 06-0397, 2009 WL 2824102, at *7 n.6 (S.D. Ohio Aug. 26, 2009) ("If the Court were forced to rely on nothing but the terms of the contract between the alleged agent and the third party to determine whether a nonsignatory principal could be bound, a principal could almost always avoid liability for contracts enter[ed] into on its behalf by an agent merely by refusing to sign the contract itself.  That result would be nonsensical given the overriding legal tenet that a nonsignatory principal is bound by his agent's contracts."), aff'd 398 F. App'x 115 (6th Cir. 2010); Restatement (Third) Agency § 6.01 cmt. c ("The parol-evidence rule does not bar proof that an agent made a contract on behalf of a principal.").

    [10] The agency agreement between Transport Investments and Maypaul in fact disclaims any actual authority on Maypaul's part to bind its principal to agreements entered into with third parties.  See Transport-Maypaul Agreement ¶ 1.3 ("For the avoidance of any doubt, the Parties

authority to bind Ms. Pinchuk, the alleged principal, based on Ms. Pinchuk's dealings with OvS, the third party.  The arbitrator, however, answered a different question.  The arbitrator concluded that OvS reasonably believed that "Ms. Dmitrieva, Mr. Ussar, Mr. Shapovalov and Mr. Chernyavskiy, among others" acted as Ms. Pinchuk's agents in "all aspect[s] of contract performance."  Award at 31 (emphasis added).  But neither the arbitrator nor OvS point to any authority that would permit a court to bind a nonsignatory principal to a contract based on the conduct of nonsignatory agents regarding the performance of that contract after it had already been executed.  Cf., e.g., Bridas, 345 F.3d at 358 ("Bridas has set forth ample evidence regarding the extent to which Turkmenneft was controlled by the Government subsequent to the signing of the JVA.  Such evidence, however, does not establish that Turkmenneft had the apparent authority to bind the Government in 1993.").  The key conduct here is Ms. Pinchuk's manifestations – made directly and through her representatives – to OvS.  See Restatement (Third) Agency § 2.03 cmt. c ("[Manifestations creating apparent authority] include explicit statements that a principal makes directly to a third party, as well as statements made by others concerning an actor's authority that reach the third party and are traceable to the principal.").

OvS has contended that Ms. Pinchuk's manifestations in prior interactions and the contract negotiations led it to reasonably believe that Maypaul signed the Agreement with Ms. Pinchuk's authority and on her behalf.  See Opp., OvS's Mem. in Support of Prima Facie Showing of Jurisdiction [ECF 10, Ex. 11] ("Prima Facie Mem.") at 11-13.  In support of this contention, OvS has cited, among other things: the fact that OvS submitted contract proposals to

---

hereby agree and confirm that [Maypaul] shall enter into agreements with third parties at its own risk, and all rights and obligations shall be attached to [Maypaul]; [Transport Investments] shall not be responsible for and bound by such agreements.").

the Pinchuks and made revisions based on Ms. Pinchuk's comments, see Mot. Vacate, 10/16/2006 Email [ECF 9, Ex. I] (letter proposal addressed to the Pinchuks); an email from one of Ms. Pinchuk's representatives stating that Ms. Pinchuk was "studying" OvS's contract proposal, Prima Facie Mem., Ex. 18; Aurika Dmitrieva's testimony that she and Ms. Pinchuk "stud[ied] the conditions for payments and scope of work" in the Agreement, see Hearing Tr. 620-21, 666-67; and Lisa Delplace's testimony that Konstantin Ussar told her that Maypaul was representing Ms. Pinchuk in signing the Agreement, see id. at 100, 150.  See Prima Facie Mem. at 12; Opp., OvS's Mem. in Support of Award [ECF 12, Ex. 12] at 14.

Ms. Pinchuk counters that "OvS could not reasonably believe that Maypaul acted for Mrs. Pinchuk" because in the course of negotiating the Agreement, the parties' initial drafts contemplated including the Pinchuks as signatories, later drafts contemplated just a corporate entity as the signatory, and the email informing OvS that Maypaul would be the signatory made no reference to the Pinchuks.  See Mot. Vacate at 27-28; id., 2004-2006 Letter Proposals; id., 1/15/2007 Draft Agreement; id., 2/2/2007 Email [ECF 9, Ex. T].  Therefore, Ms. Pinchuk argues, OvS had no reason to believe that Maypaul was "signing the contract for the Pinchuks, rather than as a substitute for them."  Mot. Vacate at 27.

The Court concludes that OvS's perception that Maypaul entered into the Agreement on Ms. Pinchuk's behalf was reasonable.  See Sigal, 586 A.2d at 1219.  Throughout the contract negotiations, up until the day the Agreement was executed, OvS believed that it was negotiating with the Pinchuks, that the project being negotiated was a residence for the Pinchuks, that the contract was subject to Ms. Pinchuk's final approval, and hence that the Pinchuks would be signing the contract.  See Hearing Tr. at 95-99; 210.  Though draft agreements left blanks for a

"legal entity" as a signatory, the blanks were part of a standard contract term, and as Lisa

Delplace explained, OvS "assum[ed] that [it] would be filling that out for the Pinchuks, since all

previous proposals had gone to them." Id. at 213.  Then, according to Delplace, on the day the

Agreement was to be signed Konstantin Ussar told Delplace that Maypaul would sign it as Ms.

Pinchuk's representative.  See id. at 150.  In light of the Pinchuks' dealings with OvS to that date,

particularly the Pinchuks' means of communicating and negotiating through representatives, OvS

had good reason to think that the Pinchuks sought to contract through a representative, i.e.,

Maypaul, as well.  Also, OvS believed that the Pinchuks owned the Property and that the

residence under construction was to be their home.  See id. at 80, 142.  Though the Pinchuks did

not in fact own the Property, no one corrected OvS's references to the project as the "Pinchuk

residence" or otherwise informed OvS that Svit Shylahiv owned the Property.  See id. at 110,

610-11.  And until the arbitration, OvS had no knowledge of either Ms. Pinchuk's preliminary

lease agreement with Svit Shylahiv or the agency agreement between Transport Investments and

Maypaul, both of which were "confidential."  See Award at 17-18; Prelim. Lease ¶ 9.1;

Transport-Maypaul Agreement ¶ 6.2.  It therefore made sense that OvS thought that the Pinchuks

were the "Owner" designated in the Agreement and that Maypaul was simply their agent.

        The Court recognizes that there are facts in the record supporting Ms. Pinchuk's position.

This case is similar in some respects to Dorsky Hodgson & Partners, Inc. v. Nat'l Council of

Senior Citizens, 766 A.2d 54 (D.C. 2001), in which the D.C. Court of Appeals rejected an

architecture firm's argument that a corporation with which it had entered into a contract had

apparent authority to bind a senior citizens organization.  There, the senior citizens organization

rather than the signatory corporation had begun the process to gain funding for the construction

project that was the subject of the contract, and the architecture firm had "repeated communications" about the project with the organization's affiliate.  Id. at 56.  But these facts "d[id] not change the reality" that the firm had contracted with the signatory corporation and "repeatedly looked to [the corporation] for payment."  See id.  In addition, the contract as originally drafted had been between the architecture firm and the organization's affiliate but, at the affiliate's insistence, had been revised "to make explicit" that the corporation was retaining the firm's services.  Id.  Similarly here, OvS signed a contract with Maypaul and was paid by Maypaul, and the contract was revised to make Maypaul the signatory in place of the Pinchuks.

But this case is different from Dorsky Hodgson because circumstances not present in that case "reasonably led [OvS] to believe" that Maypaul signed the Agreement as Ms. Pinchuk's agent.  See Dorsky Hodgson, 766 F.2d at 57.  First, as discussed above, at the time the Agreement was executed OvS was told that Maypaul was "representing" Ms. Pinchuk.  See Hearing Tr. at 100, 158.  This did not "make explicit" that Maypaul, not Ms. Pinchuk, was retaining OvS's services.  See Dorsky Hodgson, 766 F.2d at 57.  Moreover, OvS invoices were addressed to and paid by Maypaul, but OvS actually sent its invoices to Interpipe, which was Victor Pinchuk's company.  See Hearing Tr. 55, 110-12, 159, 259.  In fact, other than the address below the signature line on the Agreement, OvS had no contact information for Maypaul, and, it appears, did not communicate with anyone from Maypaul after signing the Agreement.  See id. at 279-82.  And other than initiating wire transfers to make payments, Maypaul undertook none of the Agreement's rights and obligations; the Pinchuks or their representatives undertook these rights and obligations instead.  See Award at 23.  In the Court's view, these facts substantiate the reasonableness of OvS's belief that Maypaul had authority to enter into the Agreement for Ms.

23

Pinchuk.  See Sigal, 586 A.2d at 1218-19.[11]

Based on Maypaul's apparent authority, Ms. Pinchuk was bound to arbitrate the present

dispute.  Hence, the Court will deny Ms. Pinchuk's motion to vacate the arbitrator's Award

against her.  See D.C. Code § 16-4423(a)(5).

II.    Merits

Maypaul argues that this Court should vacate the arbitrator's decision on the merits

because it manifestly disregarded District of Columbia law.  See Mot. Vacate at 30.[12]  Before

turning to the specifics of Maypaul's arguments, the Court stresses that its review of the

arbitrator's decision is "extremely limited" and that Maypaul bears a "heavy burden."  See Lopata,

735 A.2d at 940.  To establish that the arbitrator "manifestly disregarded the law," Maypaul must

show "more than a mere error" of fact or law.  See Fraternal Order of Police/Dep't of Corr. Labor

Comm. v. D.C. Pub. Emp. Relations Bd., 973 A.2d 174, 178 n.9 (D.C. 2009) (internal quotation

marks and citation omitted); Cathedral Ave. Coop., 947 A.2d at 1151 (court inquiry as to

"manifest disregard[]" may be undertaken, "at least when the decision approaches being arbitrary

and capricious") (internal quotation marks and citation omitted).  Hence, even if the arbitrator

_____

[11] The Court does not adopt the requirement, urged by Ms. Pinchuk, that an alleged
principal and agent have a "pre-existing relationship" to support a finding of apparent authority.
See Mot. Vacate at 27-28 & n.3.  Apparent authority depends not on an actual principal-agent
relationship, pre-existing or otherwise, but on the appearance of one.  See Restatement (Third) of
Agency § 2.03 cmt. a ("The definition [of apparent authority] in this section does not presuppose
the present or prior existence of an agency relationship as defined in § 1.01.").

[12] Because respondents' position is that the arbitrator did not have jurisdiction over Ms.
Pinchuk, respondents present their arguments on the merits as Maypaul's arguments.  See Mot.
Vacate at 30-38.  The Court treats them as such, but in light of the Court's conclusion that Ms.
Pinchuk was bound by the Agreement, its conclusions on the merits apply equally to Maypaul
and Ms. Pinchuk.

misapplied District of Columbia law, that would not be a basis for vacatur.

Maypaul first contends that the arbitrator manifestly disregarded the law in ruling that Maypaul breached its contract with OvS.  Mot. Vacate at 31.  Maypaul asserts that the arbitrator ignored District of Columbia law providing that an unambiguous and integrated contract, like the Agreement here, "speaks for itself and binds the parties without the necessity of extrinsic evidence."  Mot. Vacate at 31 (citing, inter alia, Lumpkins v. CSL Locksmith, LLC, 911 A.2d 418, 423 (D.C. 2006)).  But the arbitrator did not conclude that Maypaul breached the Agreement as written.  Rather, he concluded that the Agreement had been modified and that Maypaul and Ms. Pinchuk breached the Agreement as modified.  The cases cited by Maypaul do not address contract modification and are therefore inapposite.

Maypaul also criticizes the arbitrator for relying "only" on the Uniform Commercial Code ("UCC") and District of Columbia jury instructions, arguing that the UCC would preclude oral modification and the jury instruction on course of performance would preclude consideration of extrinsic evidence in these circumstances.  See Mot. Vacate at 32.  But this is an argument that the arbitrator misapplied the law, not that he manifestly disregarded it.  Moreover, Maypaul neglects to note that the arbitrator also cited District of Columbia authority on contract interpretation that permits oral modification of a written contract even if the contract requires all modifications to be in writing.  See Award at 34, 36 (citing Nickel v. Scott, 59 A.2d 206, 207 (D.C. 1948); D.C. Standardized Civil Jury Instruction § 11-23 ("Even if the written contract itself requires that all modifications to it must be in writing, the law permits the parties to modify a written contract by a later oral agreement.")); see also Puma v. Sullivan, 746 A.2d 871, 875 (D.C. 2000) ("[U]nder contract law, it is well-settled that a written contract may be modified or

rescinded by a subsequent oral agreement, even where the contract contains express language

prohibiting oral modification[.]" (citing Nickel, 59 A.2d at 207)).

Maypaul finally challenges the arbitrator's factual finding that Maypaul agreed to an oral

modification of the Agreement.  See Mot. Vacate at 33-34.  But to repeat, an error of fact does

not amount to manifest disregard of the law, and the arbitrator amply supported his finding that

the Agreement was modified in scope and duration by citing specific evidence in the record.  See

Award at 37-40 (describing, for example, a May 2008 "revised proposal for the additional scope

of work through May 2009"; "[c]hanges to a road location and elimination of a wall, just one

week before the Contract work was purportedly to be completed"; the June 2008 approval of an

electronic entry gate with "significant modifications"; the parties' August 2008 exchange of

comments on a draft addendum to the Agreement; and Lisa Delplace's trips to Kiev in the

summer and fall of 2008 at the request of Ms. Pinchuk and her representatives); id. at 39

("[N]either Maypaul nor Ms. Pinchuk could reasonably have expected that OvS would do this

work after July 1 without compensation or reimbursement of out-of-pocket expenses.").  Hence,

the Court concludes that the arbitrator did not manifestly disregard the law in ruling that Maypaul

and Ms. Pinchuk breached the Agreement as modified.

In light of this conclusion, the Court need not address the arbitrator's alternative holding

that Maypaul and Ms. Pinchuk were liable in quantum meruit.  The dollar amount of professional

services provided and expenses incurred is the same in damages as in restitution.

Maypaul also contends that the arbitrator manifestly disregarded the law in awarding OvS

reimbursable expenses, prejudgment interest, and attorney's fees and costs.  First, Maypaul

claims that the arbitrator ignored the Agreement's cap on monthly reimbursable expenses at 40%

of monthly professional fees, or $8,952, and argues that the award of $76,270.49 in reimbursable

expenses should be reduced to that amount.  Mot. Vacate at 36.  But far from ignoring the 40%

cap, the arbitrator reasoned that "throughout the duration of the Contract OvS was regularly

reimbursed for expenditures without regard to the 40% limit [in the Agreement] and without

approval from Maypaul" and, accordingly, concluded that "Maypaul acquiesced without

objection to waivers and modifications of the Contract by Ms. Pinchuk and her representatives

that overrode any limit in the Contract on reimbursable expenditures [or other requirements]."

Award at 41.  This was not manifest disregard of the law.

Second, Maypaul argues that in awarding prejudgment interest at 18% per annum, the

arbitrator ignored District of Columbia law capping prejudgment interest at 6% per annum.  Mot.

Vacate at 36.  In District of Columbia v. Pierce Associates, cited by Maypaul, the D.C. Court of

Appeals held that a trial court may not award prejudgment interest at a rate greater than 6%,

"unless an express contractual provision is to the contrary."  527 A.2d 306, 311 (D.C. 1987).  But

in Maypaul's own words, the arbitrator awarded OvS prejudgment interest "at the contract rate of

18% per annum."  Mot. Vacate at 36 (emphasis added).  It would seem that paragraph 6.2 of the

Agreement setting an interest rate of 18% per annum on past due payments is "contrary" to a 6%

rate.  And even if the arbitrator erred, he did not manifestly disregard the law because he

considered that both parties sought prejudgment interest at the contract rate and stated his

authority to award interest under the AAA Construction Rules.  Award at 47.

Finally, Maypaul argues that the Court should vacate in part the award of attorney's fees

and costs to OvS because the arbitrator "effectively granted Maypaul's counterclaim for breach of

contract."  Mot. Vacate 37.  But Maypaul cites no law that was manifestly disregarded.  The

arbitrator denied Maypaul's counterclaim and, pursuant to his authority under the AAA

Construction Rules, <u>see</u> R-45(d)(ii), awarded reasonable attorney's fees and costs to OvS as the

prevailing party in the arbitration.  <u>See</u> Award at 48-49, 53.  The Court will not disturb the

Award on this basis.

     Maypaul has not met its "heavy burden" of showing manifest disregard of the law.  <u>See</u>

<u>Lopata</u>, 735 A.2d at 940.  Accordingly, the Court will deny the motion to vacate and confirm the

Award against Maypaul and Ms. Pinchuk in its entirety.  <u>See</u> D.C. Code § 16-4423(e).

**CONCLUSION**

     For the foregoing reasons, OvS's motion for confirmation of the Award will be granted,

and respondents' motion to vacate the Award will be denied.  The Award will be confirmed in its

entirety.  A separate order accompanies this opinion.

_____
/s/

JOHN D. BATES
United States District Judge

Dated: <u>November 6, 2012</u>